**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| CARINA VENTURES LLC,<br><br>      Plaintiff,<br><br>      v.<br><br>AGRI STATS, INC.; EXPRESS MARKETS INC.; BUTTERBALL LLC; CARGILL INC.; CARGILL PROTEIN – NORTH AMERICA F/K/A CARGILL MEAT SOLUTIONS CORPORATION; COOPER FARMS, INC.; FARBEST FOODS, INC.; FOSTER FARMS LLC; FOSTER POULTRY FARMS; HORMEL FOODS CORPORATION; JENNIE-O TURKEY STORE, INC.; HOUSE OF RAEFORD FARMS, INC.; PERDUE FARMS, INC.; PERDUE FOODS LLC; PRESTAGE FARMS, INC.; PRESTAGE FOODS, INC.; PRESTAGE FARMS OF SOUTH CAROLINA, LLC; TYSON FOODS, INC.; TYSON FRESH MEATS INC.; TYSON PREPARED FOODS, INC.; AND THE HILLSHIRE BRANDS COMPANY,<br><br>      Defendants. | **COMPLAINT**<br><br><br>**Jury Trial Demanded** |

# TABLE OF CONTENTS

I.    NATURE OF ACTION ................................................................................. 1

      A.    Defendants Entered Into an Unlawful Agreement to Exchange Competitive
            Information and Reduce the Supply of Turkey. ...................................... 2

      B.    Defendants' Conspiracy Successfully Restrained Supply and Caused Supra-
            Competitive Prices. ................................................................................. 5

II.   JURISDICTION AND VENUE ................................................................. 8

III.  PARTIES ...................................................................................................... 9

      A.    Plaintiff ...................................................................................................... 9

      B.    Defendants ................................................................................................ 10

            (1)   Agri Stats and EMI ........................................................................ 10
            (2)   Butterball ........................................................................................ 10
            (3)   Cargill .............................................................................................. 11
            (4)   Cooper Farms .................................................................................. 11
            (5)   Farbest ............................................................................................. 11
            (6)   Foster Farms .................................................................................... 12
            (7)   Hormel ............................................................................................. 12
            (8)   House of Raeford ............................................................................ 13
            (9)   Perdue .............................................................................................. 13
            (10)  Prestage ........................................................................................... 13
            (11)  Tyson ............................................................................................... 14

IV.   FACTUAL ALLEGATIONS ...................................................................... 15

      A.    Agri Stats Knowingly Participated in and Facilitated Defendants'
            Conspiracy ................................................................................................ 15

      B.    Defendants Conspired to Restrain Turkey Production With the Intent and
            Expected Result of Increasing Turkey Prices. ...................................... 25

      C.    Defendants Regularly Exchanged Competitive Pricing and Production
            Information With Each Other as Part of their Coordinated Conduct. ............... 33

      D.    Regular Communications and Interactions Among Defendants Provided
            Opportunities for Collusion. .................................................................... 34

            (1)   Trade Association Events Provided Defendants Numerous
                  Opportunities to Directly Meet and Collude. .......................... 34

i

a.      National Turkey Federation ........................................................ 34

b.      United States Poultry & Egg Export Council............................ 38

c.      U.S. Poultry & Egg Association.................................................. 39

d.      North American Meat Institute .................................................. 40

(2)    Employee Movement Between Defendants Permitted Trusted Former Colleagues to Exchange Pricing and Supply Information. ................... 42

(3)    Defendants Provided One Another Frequent Access to Their Facilities, Permitting Extensive Opportunities to Share Information.................... 43

(4)    Other Informal Events Gave Defendants Private and Confidential Opportunities to Directly Exchange Pricing and Supply Information. .. 43

E.    Tyson Has Admitted Violating Federal Antitrust Law With Respect to the Pricing and Sale of Chicken During the Conspiracy Period in this Case. ......... 44

F.    The Structure of the Turkey Industry Was Conducive to Conspiracy. .............. 44

(1)    Turkey Was a Commodity Product With Inelastic Demand.................. 44

(2)    Defendants Controlled the Supply of Turkey in the United States, Which Allowed the Conspiracy to Succeed. ........................................... 46

(3)    There Were High Barriers to Entry in the Market for Turkey. .............. 47

V.    PLAINTIFF'S CLAIMS ARE TIMELY ........................................................ 48

A.    American Pipe Tolling ................................................................... 48

B.    Fraudulent Concealment ................................................................ 49

VI.   CAUSE OF ACTION: VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1 ................................................................................................. 52

VII.  REQUEST FOR RELIEF............................................................................... 57

VIII. JURY TRIAL DEMANDED ........................................................................ 57

Plaintiff Carina Ventures LLC ("Plaintiff" or "Carina"), by and through its undersigned counsel, files this Complaint against the Defendants identified below, for their illegal conspiracy, which fixed, raised, stabilized, or maintained the prices of turkey[1] sold in the United States beginning around 2008 and continuing at least through 2016, with lingering effects thereafter, the exact dates being unknown to Plaintiff prior to discovery (the "Conspiracy Period"). Plaintiff brings this action against Defendants for treble damages and injunctive relief under the antitrust laws of the United States, and demands a trial by jury.

## I.      NATURE OF ACTION

1.      Defendants Butterball LLC ("Butterball"); Cargill Inc. and Cargill Protein – North America f/k/a Cargill Meat Solutions Corporation, (collectively, "Cargill"); Cooper Farms, Inc. ("Cooper Farms"); Farbest Foods, Inc., ("Farbest"); Foster Farms LLC and Foster Poultry Farms (collectively, "Foster Farms"); Hormel Foods Corporation and Jennie-O Turkey Store, Inc. (collectively, "Hormel"); House of Raeford Farms, Inc. ("House of Raeford"); Perdue Farms, Inc. and Perdue Foods LLC (collectively, "Perdue"); Prestage Farms, Inc., Prestage Foods, Inc., and Prestage Farms of South Carolina, LLC (collectively, "Prestage"); and Tyson Foods, Inc., Tyson Fresh Meats Inc., Tyson Prepared Foods, Inc., and the Hillshire Brands Company (collectively, "Tyson") are the leading suppliers of turkey in an industry with approximately $5 billion in annual sales. The turkey industry is highly concentrated, with supply controlled by a small number of large producers in the United States. During 2008–2018, Defendants controlled approximately 70% of the wholesale turkey market in the United States.

---

[1] For the purposes of this Complaint, "turkey" includes turkey meat purchased fresh or frozen, and either uncooked or cooked.

2.      Defendant Agri Stats, Inc. ("Agri Stats") is a company that provides subscription services to a variety of agricultural industries, including the turkey, chicken, and pork industries. Agri Stats' mission is to improve the profitability of its subscribers, including Defendants, by collecting detailed, non-public information on production, prices, and costs and distributing that information to its subscribers.   Although Agri Stats publicly states that it maintains the confidentiality of the participating companies' data, it does not do so in practice.

3.      Defendant Express Markets Inc. ("EMI") is a subsidiary of Agri Stats that provides poultry (including turkey) market analysis to subscribers, including Defendants.   EMI's reports include a comprehensive daily commodity report and short and long-term price and production forecasts.   EMI advertises itself as providing accurate and timely information with detailed market perspectives of the turkey, chicken, and egg industries.

4.      The names Agri Stats and EMI are often used interchangeably by those Defendants and in the Turkey industry.   In this Complaint, references to Agri Stats or EMI both mean Agri Stats and/or EMI.

5.      Defendants each entered into an illegal agreement whereby they exchanged competitive information, including via reports prepared by Defendants Agri Stats and EMI, and engaged in coordinated supply reductions in and around 2008–2009 and again in and around 2012–2013, which were followed by periods of raising prices and maintaining supply restraints in and around 2010–2011 and 2014–2015, respectively.

**A.    Defendants Entered Into an Unlawful Agreement to Exchange Competitive Information and Reduce the Supply of Turkey.**

6.      Throughout the Conspiracy Period, Defendant received Agri Stats and/or EMI reports regarding turkey.   Through these reports, Agri Stats and EMI actively participated in and facilitated Defendants' conspiracy.

7.     Agri Stats reports are different from other, lawful industry benchmarking reports. During the Conspiracy Period, Agri Stats collected detailed data on operating metrics from its turkey-producer subscribers.   Agri Stats took this data, standardized it, and then used the standardized data to create detailed reports showing how subscribers ranked against each other on key operating metrics, including breeder production, hatchery utilization, production volume, pricing, costs, profit, sales, and slaughter information.

8.     On a regular basis, Agri Stats distributed these detailed comparative reports, which contained current and forward-looking information, to its subscribers in the turkey industry.  The type of information available in these reports is not the type of information that competitors would provide each other in a normal, competitive market.  Through its reports, Agri Stats intentionally shared Defendants' competitively sensitive supply and pricing data with other Defendants.

9.     Agri Stats reports used numeric codes for each subscriber to keep the data facially anonymous.  However, the Defendants often decoded the Agri Stats reports to identify the data of specific competitors based on their industry knowledge and the content and formatting of the reports.

10.     Agri Stats prepared monthly reports for Defendants regarding their sales of turkey that identified, on a specific product-by-product level, the prices and returns each Defendant was obtaining on its sales of turkey.  These sales reports allowed the Defendants to easily identify opportunities to raise prices that were lower than their competitors' prices.  Indeed, Agri Stats specifically marketed itself to potential participants as a way that they could "improve profitability" rather than engage in competition.

11.     None of the Agri Stats information provided to Defendants was publicly available. Agri Stats is a subscription service, which required the Defendants to pay substantial fees during

the Conspiracy Period—far exceeding other price and production indices—and to agree to submit their own data.  Agri Stats ensured that the sensitive business information it collected was available only to Defendants and other turkey producer subscribers.  Accordingly, while Defendants used Agri States reports to identify opportunities to raise their prices, turkey purchasers could not use Agri Stats data to negotiate lower prices.

12.     In addition to regular reports, in 2014, EMI worked with the Defendants to develop a "Turkey Price Discovery" program accessible through a website where subscribers could track "nearly real time pricing."  This tool, along with the regular Agri Stats reports and frequent, direct communications among Defendants about prices, allowed Defendants fix, raise, maintain, and stabilize prices throughout the Conspiracy Period.

13.     The Defendants also relied on Agri Stats and EMI to monitor each other's production and coordinate production cutbacks and thereby artificially raise prices.

14.     In 2008, the National Turkey Federation Executive Committee, which consisted almost exclusively of executives from Defendants, hired Agri Stats and EMI to report on future industry production expectations in an "outlook" study.  Based in part on that study, beginning around the late summer 2008 and continuing through at least 2009, Defendants regularly communicated with one another to coordinate cutbacks in turkey production.  Defendants Butterball, Cargill, Cooper Farms, Farbest, Foster Farms, Hormel, House of Raeford, and Prestage each made production cuts during 2008–2009.  Defendants' coordinated cutbacks were effective: from about 2010–2011, Defendants saw record high turkey prices and strong profits as a result of their coordinated conduct.

15.     In 2012, Defendants communicated about another round of industry production cuts in order to stem rising future supply levels.  During 2012–2013, Defendants Butterball,

Cargill, Cooper Farms, Foster Farms, Hormel, Perdue, and Tyson all cut turkey production. Defendants' coordinated cutbacks again worked as turkey prices quickly rose.  In 2014 and 2015, turkey supply remained constrained, and prices stayed high.

16.     In 2014, the National Turkey Federation formed a Turkey Demand Enhancement Team "with the assistance of Agri Stats/EMI . . . to make sure [they had] increased demand before more production happens such that the industry will remain at historical proven profit levels over the next five years."  Agri Stats and EMI created a "Demand Index" for the Team, providing current and forward-looking forecasts.  The "Demand Index" provided an additional means for Defendants to monitor each other's participation in, and the success of, their conspiracy.

17.     In addition to the conduct described above, numerous "plus factors" existed in the turkey industry during the Conspiracy Period that support the plausibility of Plaintiff's allegations of an agreement between Defendants to exchange anticompetitive information, restrain supply, and fix prices.  Among other things, Defendants had a motive to conspire because the rising price of grain used to feed turkeys threatened their profitability.  The turkey industry also has multiple industry characteristics which facilitate collusion, such as numerous and repeated opportunities (*e.g.*, trade association meetings) for Defendants to conspire, a high level of vertical integration, consolidation and concentration, barriers to entry preventing new entrants into the market, inelastic demand for turkey, and homogeneity of turkey as a product.

**B.      Defendants' Conspiracy Successfully Restrained Supply and Caused Supra-Competitive Prices.**

18.     Throughout the Conspiracy Period, Defendants collectively restrained the supply of turkey, causing turkey prices to rise.  As shown in Figure 1 below, Defendants' anticompetitive conduct resulted in marked reductions in total heads slaughtered during the Conspiracy Period as compared to the prior period.  Although 2008 shows an increase in total heads slaughtered

compared to 2007, the total for 2008 would have been even higher without Defendants' coordinated cutbacks during the second half of that year.

*Figure 1*



Source: USDA, commodity "Turkeys"
(https://www.nass.usda.gov/Quick_Stats/Lite/index.ph)

19.     In a competitive market, production generally matches demand, that is, production will increase in response to increased demand.  Conversely, in a competitive market, prices fall when demand and production decrease.  However, during the Conspiracy Period, United States Department of Agriculture data shows that turkey production remained artificially restrained even as demand, captured by higher per capita expenditures on turkey, rose.

20.     Figure 2 below shows that prior to the Conspiracy Period, production levels followed changes in prices as supply kept pace with demand.  After Defendants began their coordinated production cuts in 2008, prices and production began diverging in a dramatic fashion.

6

After 2010, production levels remained constant, but prices were higher.  Unlike the earlier period, production levels did not rise to meet these new prices.  This analysis indicates the decline in supply during the Conspiracy Period was  not a result of decreasing demand.  Indeed, rising prices instead simply caused per capita expenditures to rise.  But then, contrary to what would be predicted in a competitive market, per capita expenditures remained elevated because supply did not increase in response to the rising prices.

*Figure 2*



Indexed Per Capita Expenditure (PCE) and Production

*Source: USDA (www.ers.usda.gov/data-products/livestock-and-meat-domestic-data), FRED (https://fred.stlouisfed.org)*

21.     Defendants' anticompetitive conduct had the intended purpose and effect of increasing turkey prices paid by purchasers, including Plaintiff's assignor, Sysco Corporation

("Sysco").  Defendants knew and intended that their collusive conduct would artificially increase turkey prices above the level they would have been absent the conduct alleged herein.

22.     As a result of Defendants' unlawful, anticompetitive conduct, Sysco was injured because it paid artificially inflated prices for turkey during the Conspiracy Period.  Such prices exceeded the amount Sysco would have paid if the price for turkey had been determined by a competitive market.  The full amount and forms and components of Plaintiff's resulting damages will be calculated after discovery, and presented upon proof at trial.

## II.     JURISDICTION AND VENUE

23.     Plaintiff brings this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) to secure damages and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1).  Plaintiff seeks to recover actual and/or compensatory damages, treble damages, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by Defendants' anticompetitive conduct which fixed, raised, stabilized, or maintained the prices of turkey.

24.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

25.     Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391(b), (c) and (d), because one or more Defendants transacted business in this District or is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

26.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b)

manufactured, sold, shipped, and/or delivered substantial quantities of turkey throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District; and/or (e) consented to personal jurisdiction in this District as a condition of registering to do business in Texas.

27.    The activities of the Defendants, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

### III.    PARTIES

#### A.    Plaintiff

28.    Plaintiff **Carina Ventures LLC** ("Plaintiff" or "Carina") is a Delaware limited liability company, which on or around June 28, 2023 acquired various assets of Sysco Corporation ("Sysco"), including the claims that are the subject of this action, by way of a written assignment. Sysco Corporation is a Delaware corporation with its principal place of business in Houston, Texas.  Sysco is one of the leading marketers and distributors of food products and food services throughout Texas and the United States.  During the Conspiracy Period, Sysco purchased at least hundreds of millions of dollars' worth of turkey at artificially inflated prices directly from various Defendants, and/or their affiliates or agents, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.  "[H]istory and precedent" both make clear that assignees of a claim "have long been permitted to bring suit," and have standing to do so.  *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 275 (2008).

29.     Carina is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15, U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) & 26.

**B.     Defendants**

**(1)     Agri Stats and EMI**

30.     **Agri Stats, Inc.** ("Agri Stats") is an Indiana corporation located in Fort Wayne, Indiana and, from 2013 until 2018, was a subsidiary of Eli Lilly & Co.  Agri Stats is now a wholly owned subsidiary of Agri Stats Omega Holding Co. LP, a limited partnership based in Indiana.

31.      **Express Markets Inc.** ("EMI") is a wholly-owned and jointly-controlled subsidiary of Agri Stats and is located in Fort Wayne, Indiana.

32.     Defendants Agri Stats and EMI are collectively referred to as Agri Stats and/or EMI in this Complaint.

33.     Throughout the Conspiracy Period, Agri Stats and EMI knowingly participated in and facilitated the conspiracy detailed in this Complaint, including through the exchange of confidential, proprietary, and competitively sensitive data to and among Defendants, which Defendants used to implement and enforce their conspiracy.

**(2)     Butterball**

34.     **Butterball, LLC** ("Butterball") is a privately held North Carolina corporation headquartered in Garner, North Carolina.  During the Conspiracy Period, Butterball and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce to purchasers in the United States, including in this District.

**(3)** **Cargill**

35.    **Cargill, Inc.** is a privately held Delaware corporation headquartered in Minneapolis, Minnesota.  During the Conspiracy Period, Cargill and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce to purchasers in the United States, including in this District.

36.    **Cargill Protein – North America**, formerly known as **Cargill Meat Solutions Corporation**, is a Delaware corporation headquartered in Wichita, Kansas, that operates as a subsidiary of Cargill, Inc.  During the Conspiracy Period, Cargill Meat Solutions and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce to purchasers in the United States, including in this District.

37.    Defendants Cargill, Inc. and Cargill Protein – North America f/k/a Cargill Meat Solutions are collectively referred to as "Cargill" in this Complaint.

**(4)** **Cooper Farms**

38.    **Cooper Farms, Inc.** ("Cooper Farms") is a privately held Ohio corporation with headquarters in Oakwood, Ohio.  During the Conspiracy Period, Cooper Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce to purchasers in the United States, including in this District.

**(5)** **Farbest**

39.    **Farbest Foods, Inc.** ("Farbest") is a privately held Indiana corporation headquartered in Jasper, Indiana.  During the Conspiracy Period, Farbest and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate to purchasers in the United States, including in this District.

11

**(6)** **Foster Farms**

40.   **Foster Farms LLC** is a privately held California corporation headquartered in Livingston, California.  During the Conspiracy Period, Foster Farms LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce to purchasers in the United States, including in this District.

41.   **Foster Poultry Farms** is a privately held California corporation headquartered in Livingston, California.  Foster Poultry Farms is a related entity of Foster Farms LLC.  During the Conspiracy Period, Foster Poultry Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce to purchasers in the United States, including in this District.

42.   Defendants Foster Farms LLC and Foster Poultry Farms are collectively referred to as "Foster Farms" in this Complaint.

**(7)** **Hormel**

43.   **Hormel Foods Corporation** is a Delaware corporation headquartered in Austin, Minnesota.  During the Conspiracy Period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce to purchasers in the United States, including in this District.

44.   **Jennie-O Turkey Store, Inc.** is a Minnesota corporation headquartered in Austin, Minnesota.  Jennie-O is a related entity of Hormel Foods Corporation.  During the Conspiracy Period, Jennie-O and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce to purchasers in the United States, including in this District.

45.   Defendants Hormel Foods Corporation and Jennie-O Turkey Store, Inc. are collectively referred to as "Hormel" in this Complaint.

12

**(8)** **House of Raeford**

46.     **House of Raeford Farms, Inc.** is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina.  During the Conspiracy Period, House of Raeford Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce to purchasers in the United States, including in this District.

**(9)** **Perdue**

47.     **Perdue Farms, Inc.** is a privately held Maryland corporation headquartered in Salisbury, Maryland.  During the Conspiracy Period, Perdue Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce to purchasers in the United States, including in this District.

48.     **Perdue Foods LLC** is a privately held Maryland limited liability company headquartered in Salisbury, Maryland.  Perdue Foods LLC is a subsidiary of Perdue Farms, Inc. During the Conspiracy Period, Perdue Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce to purchasers in the United States, including in this District.

49.     Defendants Perdue Farms, Inc. and Perdue Foods LLC are collectively referred to as "Perdue" in this Complaint.

**(10)** **Prestage**

50.     **Prestage Farms, Inc.** is a North Carolina corporation headquartered in Clinton, North Carolina.  During the Conspiracy Period, Prestage Farms and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce to purchasers in the United States, including in this District.

51.     **Prestage Foods, Inc.** is a North Carolina corporation headquartered in St. Paul, North Carolina.  During the Conspiracy Period, Prestage Foods and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce to purchasers in the United States, including in this District.

52.     **Prestage Farms of South Carolina, LLC** is a South Carolina corporation headquartered in Camden, South Carolina.  During the Conspiracy Period, Prestage Farms of South Carolina, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce to purchasers in the United States, including in this District.

53.     Defendants Prestage Farms, Inc., Prestage Foods, Inc., Prestage Farms of South Carolina, LLC are collectively referred to as "Prestage" in this Complaint.

**(11)   Tyson**

54.     **Tyson Foods, Inc.** is a publicly traded Delaware corporation headquartered in Springdale, Arkansas.  During the Conspiracy Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce to purchasers in the United States, including in this District.

55.     **Tyson Fresh Meats Inc.** is a Delaware corporation headquartered in Dakota Dunes, South Dakota that operates as a subsidiary of Tyson Foods, Inc.  During the Conspiracy Period, Tyson Fresh Meats and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce to purchasers in the United States, including in this District.

56.     **Tyson Prepared Foods, Inc.** is a Delaware corporation headquartered in York, Nebraska that operates as a subsidiary of Tyson Foods, Inc.  During the Conspiracy Period, Tyson

Prepared Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold turkey in interstate commerce to purchasers in the United States, including in this District.

57.     **The Hillshire Brands Company** is a Maryland corporation headquartered in Chicago, Illinois that operates as a wholly owned subsidiary of Tyson Foods.   During the Conspiracy Period, Hillshire Brands and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, including but not limited to the Sara Lee Corporation, sold turkey in interstate commerce to purchasers in the United States, including in this District.

58.     Defendants Tyson Foods, Inc., Tyson Fresh Meats, Inc., Tyson Prepared Foods, Inc., and Hillshire Brands are collectively referred to as "Tyson" in this Complaint.

## IV.     FACTUAL ALLEGATIONS

**A.     Agri Stats Knowingly Participated in and Facilitated Defendants' Conspiracy.**

59.     Agri Stats is a company that provides closely guarded, non-public, subscription services to a variety of agricultural industries, including the turkey, chicken, and pork industries. Agri Stats' mission is to improve the profitability of participant companies through the provision of detailed and sensitive data gathered from competitors.

60.      Agri Stats presents itself as "kind of a quiet company" with a minimal public presence.  Agri Stats owns a number of subsidiaries, including EMI, which provide benchmarking services to the agricultural industries.

61.     As described above, Agri Stats collects detailed data on almost every conceivable operating and financial metric from its subscribers operating in the turkey industry, including Defendants.  During the Conspiracy Period, Agri Stats' auditors took this data, reconciled it in a general ledger, and then created standardized, detailed reports and graphs containing current and forward-looking information and comparing the subscribers on key operating metrics, including

prices, costs, sales, profits, production levels and long- and short-term production capacity.  At least monthly, Agri Stats produced these detailed comparative data reports to its subscribers in the turkey industry using numeric codes for each subscriber to keep the data facially anonymous.

62.     Agri Stats reports identified, on a specific product-by-product level, the prices, and returns each Defendant was obtaining on its sales of turkey.  These reports, available only to Agri Stats subscribers, allowed the Defendants to easily identify where their prices for turkey products were significantly lower than their competitors.

63.     EMI (a wholly-owned subsidiary of Agri Stats) provided forward-looking turkey price and production information to subscribers.  On EMI's publicly available webpage Amanda Martin, an EMI economist stated that Agri Stats "audited turkey and broiler sales and product mix data, and worked with processing and further reprocessing reports."  The reports also included breeder reports that allowed Defendants to assess how many turkeys were being placed into production at any time.

64.     In early 2014, EMI worked with Defendants to develop a "Turkey Price Discovery" program accessible through a website where subscribers could track "nearly real time pricing."  In March 2014, EMI began issuing weekly price and variance reports to participants, and a representative explained that prices were "a 3 day moving average" and participants were "able to quickly see how your invoices stack up to the averages."  In July 2014, subscribers, including Butterball, Cargill, Hormel, and Perdue could access the website.

65.     According to public reports, the sales data contained in Agri Stats and EMI reports was less than six weeks old.

66.     In 2009, Michael "Blair" Snyder, a senior executive at Agri Stats, publicly commented that "about 95% of the turkey industry" was participating in Agri Stats, and that for

16

"turkey participants, pretty much it's a list of who's who in the turkey business."  This is a comparable portion to the percentage of broiler chicken industry participating in Agri Stats reports, with Mr. Snyder stating that "we've got high 90 percentage of both broilers and turkeys."[2]

67.     A 2010 presentation slide listed each of the Defendants by name: Defendants Butterball, Cargill, Cooper Farms, Farbest, Foster Farms, Hormel (listed as Jennie-O Turkey Store, the brand name for Hormel's turkey operations), House of Raeford, Perdue, Prestage, and Tyson (listed as Sara Lee) were all participants in Agri Stats' reports on turkey.



68.     Public reports suggest that Agri Stats' fee records will confirm that each of the Defendants subscribed to Agri Stats and/or EMI throughout the Conspiracy Period.  It has also been publicly reported that Confidential Witness 1 (a former sales executive at Butterball involved in the pricing of turkeys), Confidential Witness 2 (a former accountant at Cooper Farms involved with monthly transmission of cost data to Agri Stats) and Confidential Witness 3 (a former Cargill

---

[2]     Sanderson     Farms     Investor     Day     (Oct.     29,     2009),     *available     at* https://www.sec.gov/Archives/edgar/data/812128/000095012309057735/g21049exv99w1.htm.

employee) each stated that their companies received Agri Stats reports on turkey during the Conspiracy Period.

69.     Agri Stats publicly represents that its services preserve the confidentiality of participating companies, and Agri Stats reports are nominally anonymous.  However, Defendants were often able to deanonymize the reports to identify the data of specific companies based on their industry knowledge and the manner in which the information was presented.  For each of its reports, Agri Stats identified the list of participants who were contributing data or information to the reports.  The small number of individual companies providing data in a particular category or region revealed the identity of each participant.  In addition, Agri Stats reports were so detailed that Defendants could discern the identity of competitors' data due to the specific type of products each was known to produce, or based on knowing the identity of Defendants' individual complexes.

70.     For example, it has been publicly reported that Confidential Witness 1 (Butterball) confirmed that the reports Agri Stats prepared for Defendants identified the participants that provided data for each report, which allowed Defendants to understand which of their competitors were participating for each report.

71.     According to public reports, Confidential Witness 2 (Cooper Farms) confirmed that the Agri Stats reports identified each of the turkey production facilities that were participating in the reports.  Confidential Witness 2 stated: "you could usually figure out who was who because they have a certain cooked meat, or if they were browning and running it through an oven." Confidential Witness 2 further stated: "we could sit there and discuss it, because a lot of us knew what the other plants in the big areas, what they did."  For example, Confidential Witness 2 stated that one competitor company had five separate facilities included in the Agri Stats reports, and that

therefore, it was easy to determine the identity of that company.  Based on public reports, Confidential Witness 2 accounts of Cooper Farms' deanonymization of Agri Stats reports are confirmed by documents, and other Defendants engaged in similar conduct.

72.     Defendants relied on Agri Stats reports in their analysis of their business operations. Hormel, for example, stated in a 2011 Investor Day presentation that "when you optimize the supply chain" you "improve your relative industry position (Agri Stats)."  Hormel also touted that "Jennie-O Turkey Store is consistently one of the top companies in operating profits (Agri Stats)."

73.     According to Confidential Witness 1, a former Butterball sales executive, Agri Stats reports included a ranking of the participants based on returns (*i.e.*, prices).  Because Butterball and other Defendants could decode the reports' participants, they used the reports to compare themselves against specific competitors, not just the industry in general.  As Confidential Witness 1 explained, he and other Butterball sales personnel used Agri Stats reports to "evaluate—by item, item group, price, distribution—where [Butterball] stood against other turkey companies."  He further explained that Agri Stats reports played an important role in Butterball's price-setting process.  Confidential Witness 1 stated that he looked at the Agri Stats data to assess costs and returns.

74.     Agri Stats was in a unique position to share information among Defendants.  In addition to monthly reports, Agri Stats also offered "On-Site Live Review Presentations" two to four times a year to "ID opportunities & strengths[,] Targets, Actions Plans, Strategies, Progress, Trend Analysis, Graphs."

75.     Public sources indicate that Confidential Witness 1 (Butterball) confirmed Agri Stats gave live presentations to some or all of the Defendants to explain to them how to use the reports that Agri Stats prepared on the turkey industry and how to compare themselves against

their competitors.  During the presentations, Agri Stats said, "if you are number one priced out of 13, that meant the return was so much versus the other companies."  Butterball regularly participated in such meetings with Agri Stats.

76.     According to publicly available reports, Confidential Witness 2 stated that top executives from Cooper Farms' Leadership Management Group met every six months with Agri Stats representatives and "received advice" that helped Cooper Farms improve its returns per pound.  Public sources indicate that documentary evidence will confirm Cooper Farms used Agri Stats reports to maintain high profit margins.

77.     Confidential Witness 3 (Cargill) has also stated, according to public sources, that monthly Agri Stats turkey reports went directly to Cargill finance executives.

78.     In the chicken industry, Agri Stats reports contain data on "the number of broilers placed, chick mortality by week and percentage, chick cost, days between flocks provided to contract farmers, feed conversion rates, and average daily weights.  It has been publicly reported that the information provided in reports for the turkey industry is substantially similar.  Having access to this data enabled the Defendants to monitor industry-wide supply levels.

79.     In the pork industry, Agri Stats reports enable subscribers to compare the prices they charge for individual products against the national average net price, and against the national top 25 percent average price.  Notably, Agri Stats identified opportunities for the pork integrator companies to raise prices.  For instance, for each product, Agri Stats specifically broke out the variance between the company's price and the national average price, as well as the economic impact of the variance.  This allowed the pork co-conspirators to see how much more they could charge if they charged either the national average price or the average of the top 25% national average price.

80.     One presentation from Agri Stats shows the level of detail provided to competitors regarding profits in the swine market:[3]

**Top 25% in Profit - Variances to Average Company - 2009-2007**

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2009** | | | | | | | | | | | | |
| VAR to AVG | 2.93 | -0.85 | -2.17 | 3.98 | -2.46 | -2.05 | -35.50 | -9.39 | -0.16 | -0.20 | -1.07 | 0.23 |
| avg book | 41.19 | 3.23 | 50.12 | 263 | 187.82 | 9.99 | 3862 | 215.18 | 28.68 | 11.60 | 14.69 | 22.05 |
| % var to Avg | 92.89 | 126.31 | 104.33 | 98.49 | 101.31 | 120.52 | 100.92 | 104.36 | 100.57 | 101.69 | 107.27 | 98.93 |
| variance | 12 | | | 11 | 7 | | 8 | | 9 | 6 | | 10 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

35,001,089 Pigs Finished

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2008** | | | | | | | | | | | | |
| VAR to AVG | 1.89 | -1.08 | -3.72 | 8.38 | -6.75 | -2.45 | -20.56 | -23.41 | 0.36 | 0.17 | -2.34 | 1.50 |
| avg book | 47.44 | 3.09 | 55.00 | 261 | 189 | 11.18 | 3908 | 249.69 | 32.52 | 11.33 | 14.24 | 22.72 |
| % var to Avg | 96.01 | 134.94 | 106.76 | 96.79 | 103.57 | 121.92 | 100.53 | 109.38 | 98.88 | 98.46 | 116.46 | 93.42 |
| variance | 11 | | | 10 | 6 | | 7 | | 8 | 9 | | 12 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

30,785,319 Pigs finished

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2007** | | | | | | | | | | | | |
| VAR to AVG | 1.04 | -0.51 | -1.93 | 5.14 | -2.29 | -2.30 | -75.57 | -0.21 | -1.00 | 0.09 | -0.69 | 1.16 |
| avg book | 46.69 | 2.36 | 44.75 | 260 | 187 | 10.98 | 3913 | 182.98 | 28.16 | 11.12 | 14.05 | 22.40 |
| % var to Avg | 97.78 | 121.43 | 104.31 | 98.02 | 101.22 | 120.96 | 100.11 | 100.11 | 103.56 | 99.21 | 104.90 | 94.82 |
| variance | 11 | | | 10 | 7 | | 6 | 8 | | 9 | | 12 |
| ranking | | 1 | 4 | | | 2 | | | 5 | | 3 | |

22,306,500 Pigs finished

According to public reports, the information provided in Agri Stats turkey reports—and the uses to which the information can be put—was substantially similar in the turkey market.

81.     The particular Agri Stats report referenced above shows the ranking of each company in profitability and compares the company to its competitors by providing the variance from the average.  The Agri Stats report actually circulated to competitors contained even further detail.

82.     The purpose of these reports was not to provide better prices to consumers or to allow for more efficient production.  Instead, the clear purpose was to improve the profitability of

---

[3] Greg Bilbrey, *Key Drivers to Farm Profitability* (2011).

the Defendants by identifying opportunities for them to raise prices.  A common saying by Agri Stats was "you cannot produce your way to the top of the page."  Rather, Agri Stats has stated that "the ultimate goal is increasing profitability – not simply increasing level of production."[4]

83.    Indeed, much of the information shared by Agri Stats and Defendants was unnecessary to achieve any benefits for consumers.  Exchanging individual company data (particularly current data on prices and costs) is not required to achieve major efficiencies.  In fact, in a truly competitive market, the participants would closely protect their competitively sensitive information from disclosure, because providing it to competitors would be to their disadvantage—unless, of course, there was an agreement or understanding among them that they would use the information to the joint benefit of each other as occurred in the turkey industry.

84.    In a February 15, 2017, Bloomberg article relating to Agri Stats' roles in the broiler industry, it was reported:

> "Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data—for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them," he says. ***That is what creates stability for a cartel***."[5]

---

[4] Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, London Swine Conference – Tools of the Trade (April 1-2, 2009).

[5] Christopher Leonard, *Is the Chicken Industry Rigged?*, Bloomberg (Feb. 15, 2017), https://www.bloomberg.com/news/features/2017-02-15/is-the-chicken-industry-rigged#xj4y7vzkg (emphasis added).

85.     Agri Stats knew that it played a central role in facilitating this anticompetitive information exchange.  One presentation from Agri Stats regarding the swine industry spoke directly on this point, pointing out to industry participants that they could not undertake such a detailed cost analysis between competitors without Agri Stats auditing and standardizing the data:[6]

## Data Integrity

- Benchmarking is very important but it is hard to make sure data is comparable across companies.
- Even if all companies include the same costs the costs can be calculated differently.
- Lots of variation in cost accounting in industry.
- Companies can select key metrics, common calculations and implement an effective benchmarking program.



86.     Agri Stats stated that to ensure data contained in the reports was accurate, the participants had to "agree on calculation and data collection procedures," they must "[d]etermine *tolerance and outlier status and enforce*," they must "[h]ave an administrator to compile the data and enforce procedures," and most importantly, "*[e]ach participant has to commit*."[7]

87.     The information gathered by Agri Stats was not publicly available, or even available to industry participants equally.  Agri Stats only allowed a company to access the data in its reports if the company contributed its own data to the report, thus ensuring that only Defendants

---

[6]     Greg     Bilbrey,     *Data     Integrity*,     Slideshare.net     (Sept.     21,     2015), https://www.slideshare.net/trufflemedia/gregbilbrey-data-integrity-using-records-for-benchmarking-and-operations.

[7] *Id. (emphasis added).*

and similarly situated turkey producers had access to the data.  Agri Stats also did not provide data to USDA.

88.     This information asymmetry ensured that data from Agri Stats was only available to one side of the market—Defendants.  The other side of the market, purchasers of turkey, were not allowed to access the Agri Stats data, and thus could not use Agri Stats data to negotiate lower prices.  Thus, Agri Stats reports could be used for anticompetitive purposes by Defendants but not for procompetitive purposes by purchasers.  The reports' anticompetitive effects were amplified by the fact that customers did not know Defendants were exchanging confidential information.

89.     The information exchange by the Defendants through Agri Stats is exactly the type of information exchange that the Supreme Court has recognized is likely to have anticompetitive effects.  *First*, the data is current and forward-looking—which courts consistently hold has "the greatest potential for generating anticompetitive effects."[8]  *Second*, information contained in Agri Stats reports is specific to the turkey producers, including information on profits, prices, costs, and production levels.  *Third*, none of the Agri Stats information was publicly available.  Agri Stats ensured that its detailed, sensitive business information was available only to Defendants and not to any buyers in the market.

90.     Furthermore, the exchange of information through Agri Stats at issue in this case is of a type and frequency that acts as a plus factor supporting an inference of a price-fixing agreement among Defendants.  As Justice Sotomayor held while serving on the Second Circuit,

---

[8] *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978).

"[i]nformation exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement."[9]

## B.     Defendants Conspired to Restrain Turkey Production With the Intent and Expected Result of Increasing Turkey Prices.

91.     Beginning around late 2006, feed prices, the primary cost for growing turkeys, began to rise rapidly, due in part from the new market for corn created by renewable energy in the United States.  Rising feed prices increased costs for turkey producers, and provided them with a motive to conspire to restrain supply and inflate prices.

92.     According to public sources, by June 2008, Defendants began discussing in detail the potential for industry-wide cutbacks.  In July 2008, the Executive Committee of the National Turkey Federation ("NTF")—a turkey industry trade association dominated by Defendants' representatives—agreed to hire Agri Stats and EMI to conduct an outlook study determining future supply based on a belief that industry-wide turkey supply needed to be "right-sized."  The NTF circulated draft reports and solicited feedback in various forms, including at an in-person meeting in October 2008.  The drafts included analysis of production and pricing expectations.  The NTF provided a final version, dated November 12, 2008, to the NTF Executive Committee, and members received a revised version in July 2009.

93.     It has also been publicly reported that in late Summer and Fall 2008, Defendants regularly communicated internally and at times with one another regarding coordinated cutbacks in turkey production.  For example, in August 2008, Cooper Farms executives communicated internally that Foster Farms was "in the process of cutting their turkey production.  They just

---

[9] *Todd v. Exxon Corp.*, 275 F.3d 191, 198-99 (2d Cir. 2001) (Sotomayor, J.) (noting that information exchanges can both be evidence of a *per se* unlawful price fixing cartel and separately unlawful in and of themselves).

haven't decided how to do it.  Kill breeders, cut placements what ever [sic]."  In November 2008, a Cooper Farms "Turkey industry cutbacks report" showed specific cutbacks in poults placed by Hormel and House of Raeford.

94.     According to public documents, Butterball's December 2008 Results Review presentation noted: "We have been reducing production and had a dramatic 20% drop in December versus prior year that allowed us to finish the year 92% under last year's total production.  These year to year cuts will continue into 2009 as we continue to do our part to reduce the excess meat in the industry that is driving the depressed markets."

95.     Although virtually all of Defendants' misconduct was concealed from purchasers and the public, Defendants sometimes signaled the need for cutbacks to each other through public statements.  For example, in November 2008, Keith Shoemaker, then CEO of Butterball, publicly stated "the industry will cut 6.5 percent to 7 percent of production, which reached 7.4 billion pounds last year.  But given the amount of turkey meat in storage, it will take until at least April or May to get all that out of inventory."

96.     It has been publicly reported that at the start of 2009, Defendants directly communicated with each other to encourage additional cutbacks.  For example, in a January 2009 email, a representative of Hormel presented industry plans for cutbacks gathered from direct communications with other Defendants.  The Hormel representative wrote internally that a Butterball representative directly communicated Butterball had "another cutback coming" and detailed the reductions, writing "[t]otal cutbacks would be, compared to last year, about 159,000 head/week, 31,800/day.  [The Butterball representative] says that these [February] cutbacks are as much as they can do, accord to those above him.  They have trimmed as much as they can, and if

26

the industry needs further cutbacks, they will not be the ones to do it.  Somebody else needs to step up to the plate."

97.     Public statements indicate that Butterball's monthly 2009 Results Reviews demonstrated further cutbacks.  In February 2009, Butterball reported its kill volumes were down nine percent from the previous year, and in May 2009, Butterball reported its kill volumes were down 23 percent from the previous year.

98.     According to public sources, in January 2009, Cooper Farms reported that Farbest directly communicated it had frozen turkey breast meat.

99.     Public sources further state that Cargill internal documents in January and February 2009 indicated: "Cargill Turkey Production has cutback 8.0% on our weekly placements versus budget.  Most of these are Big Toms.  The Industry cutback is approximately 10% of the average weekly placements from 2007.  Most of these are Big Toms."

100.     In February 2009, the CEO of Hormel stated on an earnings call that Hormel would "continue to work aggressively to reduce production at [Hormel]."

101.     According to public documents, Executives at Cooper Farms indicated in internal correspondence in March 2009 that the President of Farbest "was so nervous at the [National Turkey Federation meeting]" and "was lobbying everybody to do something about prices/production."  Farbest's President wrote in an email one month earlier, "I have been at the National Turkey Federation Convention all last week. . . . The industry cutbacks are on the way, but I am afraid they are late and will not be enough to promote a huge rise in breast revenue until next year."  The industry evidenced cutbacks throughout 2009.

102.     In May 2009, Hormel's CEO confirmed on an earnings call that Hormel had engaged in increasing production cuts over the past year, stating, "We announced the production

cuts last year and that production cut indeed is flowing through the system.  We had announced 7 to 8% and then we added a little bit to the cut and so when all is said and done, we ended up in the low double-digit range of actual kind of meat being produced in the plants during the quarter." Hormel's CEO emphasized that the "production cuts going forward will still be in place." According to public reports, during earnings calls during the Conspiracy Period, Hormel repeatedly discussed the industry's success in cutting production and maintaining industry-wide discipline.

103.   In September 2009, according to public sources, Butterball internal documents hypothesized from Agri Stats data that Prestage had cut back and that Cooper Farms "most recently have cutback."

104.   During the February 2010 National Turkey Federation ("NTF") annual conference, Yubert Envia (vice president of turkey and prepared foods for Foster Farms) alluded to the coordinated cutbacks of 2009 in his acceptance speech when he was elected NTF chairman.  He recognized the turkey industry had "held together with coordination and collaboration" in 2009 and expressed optimism about the turkey industry's future profitability but emphasized, "I don't think we should be relying on production as an indicator."[10]

105.   From 2010 through 2011, Defendants saw record high turkey prices.  It has been publicly reported that a senior executive at Hormel wrote in March 2010, "[t]his is unprecedented levels of cutbacks in the turkey industry, and they appear to be continuing," then subsequently suggested price increases.  A "Communication of Results" PowerPoint made by Perdue in

---

[10] *New NTF Chairman Optimistic for the Future*, The Poultry Site (Feb. 18, 2010), https://www.thepoultrysite.com/news/2010/02/new-ntf-chairman-optimistic-for-the-future.

November 2010 stated, "Bottom Line: Accounts will scramble from Thanksgiving and Christmas . . . we need to push price up and say 'NO!'"

106.    In 2012 and 2013, Defendants communicated about another round of industry production cuts.  According to public reports, while at the 2012 National Turkey Federation Convention, a representative from Cooper Farms wrote, "I'm at a Turkey Federation convention. We have a plan to reduce wing production by 50% starting in March."

107.    Public documents indicate that in April 2012 communications on financing, Perdue represented, "we consciously decreased [both chicken and turkey] production and started walking away from bad business during the fourth quarter."

108.    In August 2012, per public records, Cooper Farms internal correspondence based on communications with the Virginia Poultry Growers Cooperative indicated that Butterball was in the process of making cuts.  Also in August 2012, internal Cooper Farms correspondence reported that Cooper Farms was planning to make cuts.

109.    In September 2012, House of Raeford sent an email to customers informing them that it had decided to cut back on turkey production and could no longer service their account.

110.    It has been publicly reported that in internal conversations in the Fall of 2012, Cargill and Farbest discussed expectations about the actions of other Defendants and the industry as a whole cutting back.  For example, in November 2012, an internal presentation at Cargill stated, "We believe industry supply reductions are beginning, led by Cargill."  The presentation when on to outline cuts taking place and expected in the future.

111.    Also in November 2012, according to public documents, Farbest executives reported that Perdue was planning to announce "a 5% reduction in placements, putting a hold on

starting new barns, and destroying approximately 50,000 poults per week." Then in January 2013, a representative of Cooper Farms reported that Perdue was "cutting back 5-10%."

112.    In January 2013, a representative at Cargill reportedly told a commodity sales manager at Hormel that Cargill was planning to cutback significantly.

113.    Also in January 2013, according to public sources, a representative of Cooper Farms encouraged recipients of an internal email to "nose around and see what other cuts were being made." That same month, internal correspondence at Cooper Farms indicated "Cargill has cut production," and a Cooper Farms representative reported, "I heard growers have received a letter from [Tyson] saying they are to cut back 15% on their placements for the next year. This starts in 60 days."

114.    In February 2013, following the National Turkey Federation Annual Conference, Cooper Farms internal notes reportedly summarized direct communications where a Cargill representative told him, "Cargill has made huge cutbacks in their placements of toms and hens."

115.    Public documents indicate that in February 2013, Cooper Farms representatives confirmed cutbacks and emphasized that cutting back was a "no brainer" to prioritize "taking advantage of current conditions . . . to help us through the tough times."

116.    Also during February 2013, a Hormel representative reportedly wrote in internal correspondence that Hormel "cut back approximately 3% for 2013."

117.    Per public sources, in March 2013, Hormel executives discussed internally information directly from Tyson about planned cutbacks.

118.    Also in March 2013, an internal email amongst Foster Farms representatives reportedly indicated plans to consider the cost effects of "reducing bird production."

119.     In May 2013, public statements by Urner Barry's Vice President Russ Whitman signaled more projected cutbacks by stating "dramatic declines" in turkey production were imminent.  "He cited the sharp year-to-date decline in egg sets as being the root of the anticipated contraction in production.  So far in 2013, egg sets depict a retreat in year on year figures of 7% and poult placements are declining at an even more severe pace due to the numbers of them being destroyed.  Whitman said that by projecting placements forward, we can ascertain that slaughter figures should start to show significant reductions in late June into early July."

120.     In the Summer and Fall of 2013, the industry exhibited coordinated cutbacks.  It has been publicly reported that, in June 2013, Hormel's Strategic Planning indicated, "it is encouraging to see the industry contraction on the supply side," and a Cooper Farms executive marked the potential for "improved turkey market commodity prices resulting from first half of 2013 cutbacks."

121.     In July 2013, a Tyson representative reportedly told Farbest, "[w]e have cut back some Turkey production just like everyone else in the industry."

122.     In August 2013, according to public reports, a Hormel representative wrote, "Current estimate is that the production will be cut back."  Also in August 2013, Foster Farms again evaluated whether they "were producing too much meat" and should reduce internal supply.

123.     It has been publicly reported that, in September 2013, Cargill internally discussed messaging, stating, "Whatever we do, we [don't] want to signal any competitors we are reducing so they can just place more."

124.     Prices for turkey increased in 2014.  In March 2014, a Butterball representative reportedly wrote, "We don't always get supply, demand, cost, and industry discipline to line up like this.  We need to do our part and bring home plan/ kill the incentive!"

125.    Public sources indicate that in April 2014, a Cargill representative reported, everybody is getting a price increase."   Cargill prepared a "Turkey Market Information" presentation the same month describing cutbacks, a "total supply chain decrease," and new market baselines, reporting that breast meat was "near record high! – Supply is short and pricing is continuing to rise."

126.    The following month, Perdue produced an internal presentation that is reported to contain slides stating hen price per pound were on a "steady climb to historic heights," and 2014 prices were "getting dizzy."

127.    In 2014, Defendants worked together to ensure the record high profits they were enjoying continued for the long term.   According to public reports, the Turkey Demand Enhancement Team set an initiative of "20 by 2020," a goal of increasing turkey consumption in the United States from sixteen pounds per capita to twenty pounds per capita by 2020.   As Gary Cooper, COO of Cooper Farms and Chairman of the 2014 National Turkey Federation Executive Committee, explained in an email to an industry contact, the purpose of the program was to "make sure that we have increased demand before more production happens such that the industry will remain at historical proven profit levels over the next five years."   Defendants described the new initiative as reflecting a "coopetition" approach, combining cooperation and competition.   In March 2014, the Turkey Demand Enhancement Team tasked Agri Stats and EMI with creating a regularly updated "demand metric" initiative to "monitor production" and supply growth.

128.    In a competitive market, producers of a commodity product like turkey would respond individually to fluctuations in demand, naturally causing supply to closely track demand, and keeping prices competitive and fair.   Defendants subverted competition by working together to make sure demand always outstripped supply, thereby artificially inflating prices.

129. In 2014 and 2015, supply remained constrained, and prices stayed high. According to public sources, representatives at Butterball and Cooper Farms recounted record profitability on certain products in 2015.

**C. Defendants Regularly Exchanged Competitive Pricing and Production Information With Each Other as Part of their Coordinated Conduct.**

130. Public reports suggest that throughout the Conspiracy Period, Defendants regularly exchanged competitive pricing information with each other via email, text messages, and phone conversations. These repeated exchanges of competitive pricing information further support a plausible inference of an agreement among Defendants to restrain supply and stabilize prices.

131. For example, according to public sources, in February 2010, a Cooper Farms representative wrote that the head of commodity sales at Butterball "was upset at [Hormel] for selling breast meat behind the market, just couldn't seem to understand why they would do that and let their feelings known to the [Hormel] folks."

132. Public sources also indicate that in February 2014, one representative at Hormel wrote in discussions on pricing strategy: "I have Cargills deck and Butterballs pricing. Cargills is telling the same story as we are in terms of supply and pricing."

133. According to public reports, Defendants also participated in the "Midwest Consortium," an informal group created for "emergency preparedness," where they shared detailed information on current production and capacity and met in-person on an annual basis. The members included executives from Cargill, Cooper Farms (COO Gary Cooper),[11] Foster Farms,

---

[11] *New Chairman, Committee for National Turkey Federation*, The Poultry Site (Mar. 6, 2014), https://www.thepoultrysite.com/news/2014/03/new-chairman-committee-for-national-turkey-federation.

Perdue, and Prestage.  In August 2010, the Midwest Consortium issued a revised mission statement that documents would "offer statistics on each participating company and [ ] be updated annually."

**D.      Regular Communications and Interactions Among Defendants Provided Opportunities for Collusion.**

**(1)      Trade Association Events Provided Defendants Numerous Opportunities to Directly Meet and Collude.**

134.      During the Conspiracy Period, Defendants were members of several turkey-related trade associations.  Defendants planned months in advance to attend these trade association meetings and events and to have the opportunity to meet privately to discuss the turkey industry. Regular and frequent attendance by Defendants' CEOs and top-level executives at trade association meetings was the norm rather than the exception during the Conspiracy Period.  These repeated opportunities for contact at trade association meetings were important for developing relationships among Defendants that facilitated their conspiracy.

135.      Some of the trade association conferences regularly attended by Defendants during the Conspiracy Period included those of the National Turkey Federation, USA Poultry & Egg Export Council, the US Poultry & Egg Association, and the North American Meat Institute.

**a.      National Turkey Federation**

136.      As discussed above, the National Turkey Federation ("NTF") is a national association of turkey producers.  Members include growers, processors, hatchers, breeders, distributors, allied services, and state associations.  Headquartered in Washington, D.C., the NTF represents more than 95 percent of the turkey industry.  It is the only association representing the turkey industry in the United States.

137.      In addition to regular board and executive committee meetings, the NTF holds an Annual Convention in February and a Leadership Conference in July where turkey industry

executives gather and discuss turkey-related information.  The Annual Convention is the largest event for the turkey industry nationwide, offering unparalleled networking opportunities for the hundreds of turkey industry executives who attend.

138.    Executives from every Defendant served on the NTF Board of Directors and Executive Committee at various points during the Conspiracy Period.  Indeed, throughout the Conspiracy Period and continuing to the present, Defendants have dominated the NTF leadership. For example, individuals from each Defendant served on the 2009 NTF Executive Committee, and Walter "Gator" Pelletier (corporate secretary of Butterball) served as chairman of the Board.

139.    At the February 2010 NTF Annual Convention, Yubert Envia, vice president of turkey and prepared foods for Foster Farms, was elected chairman of the NTF Board of Directors. In his acceptance speech, Mr. Envia commented that the NTF had a "powerful membership base that [was] willing to help each other" and "open their doors" to "ensure[] the strength and viability of this outstanding trade association."  Walter "Gator" Pelletier (corporate secretary of Butterball) assumed the position of immediate past-chairman upon Mr. Envia's election to the role.   In addition to Mr. Envia, the 2010 NTF Board of Directors included Steve Willardsen (president of Cargill Value Added Meats) as secretary-treasurer.[12]

140.    Also during the February 2010 NTF Annual Convention, the Board reelected Gary Cooper (Cooper Farms) and Ted Seger (Farbest), among others, to the Executive Committee. Elected to the Executive Committee were John Reicks (Sara Lee Food and Beverage) and Ron Prestage (Prestage Farms).  After the Board meeting, Jim Leighton (Perdue) and Petri Papinaho (Jennie-O Turkey Store) were appointed to the Executive Committee.[13]

---

[12] *New NTF Chairman Optimistic for the Future*, The Poultry Site (Feb. 18, 2010), https://www.thepoultrysite.com/news/2010/02/new-ntf-chairman-optimistic-for-the-future.
[13] *Id.*

141.    At the February 2011 NTF Annual Convention, the board of directors elected Steve Willardsen (president, Cargill Value Added Meats) as vice chairman.  Yubert Envia (VP of turkey and prepared foods, Foster Farms) assumed the position of immediate past chairman.[14]

142.    Also at the February 2011 NTF Annual Convention, the board reelected Gary Cooper (Cooper Farms) Ron Prestage (Prestage), John Reicks  (Sara Lee), and Ted Seger (Farbest) to the Executive Committee.  The board elected Jim Leighton (Perdue Farms) to his first term as an Executive Committee member.

143.    The NTF 2012 Executive Committee included Steve Willardsen (Cargill Value Added Meats) as Chairman and Gary cooper (Cooper Farms) as Secretary-Treasurer.  Other 2012 Executive Committee members included Yubert Envia (Foster Farms), Jim Leighton (Perdue), Glenn Leitch (Jennie-O Turkey Stores), Walter Pelletier (Butterball), Ron Prestage (Prestage), and John Reicks (Hillshire Brands).[15]

144.    Members of the 2012 NTF Board of Directors included Steve Willardsen (Cargill Value Added Meats), Yubert Envia (Foster Farms), John Reicks (Hillshire Brands), Glenn Leitch (Jennie-O Turkey Stores), John Prestage (Prestage), Scott Prestage (Prestage), Gary Cooper (Cooper Farms), Ron Prestage (Prestage), and Jim Leighton (Perdue).[16]

---

[14] *National Turkey Federation Elects 2011 Chairman*, Progressive Grocer (Feb. 14, 2011), https://progressivegrocer.com/national-turkey-federation-elects-2011-chairman.

[15] National Turkey Federation, 2012 Annual Report at 15, *available at* https://issuu.com/turkeyfed/docs/2012ntfannualreport.

[16] *Id.* at 17.

145.   Gary Cooper (COO of Cooper Farms) was elected as vice chairman of the NTF Board of Directors at the February 2013 Annual Convention. Steve Willardsen (president of Cargill Value Added Meats Retail) assumed the position of immediate past chairman. [17]

146.   Gary Cooper (COO of Cooper Farms) was elected chairman of the 2014 NTF Board of Directors at the NTF Annual Convention in February 2014.  The 2014 Board also included John Reicks (vice president of operations of Hillshire Brands) as secretary-treasurer.[18]

147.   During the 2014 NTF Annual Convention, the Board reelected Yubert Envia (Foster Farms), Ruth Kimmelshue (Cargill), Glenn Leitch (Jennie-O Turkey Store), and Ron Prestage (Prestage), among others, to the NTF Executive Committee.  After the Board meeting, the elected Executive Committee members appointed Rod Brenneman (Butterball) and Phil Seger (Farbest) to the Executive Committee as at-large members.[19]

148.   At the February 2015 NTF Annual Convention, John Reicks (vice president of internal operations for Tyson Foods) was elected to serve as vice-chairman.  Gary Cooper (COO of Cooper Farms) assumed the position of immediate past chairman.[20]

149.   At the same NTF Annual Convention, the NTF Board reelected Executive Committee members Kerry Doughty (Butterball), Ruth Kimmelshue (Cargill), Glenn Leitch (Jennie-O Turkey Store), and Phil Seger (Farbest), among others.[21]

---

[17] *National Turkey Federation Elects Board of Directors*, Poultry World (Feb. 26, 2013), https://www.poultryworld.net/poultry/national-turkey-federation-elects-board-of-directors/.

[18] *New Chairman, Committee for National Turkey Federation*, The Poultry Site (Mar. 6, 2014), https://www.thepoultrysite.com/news/2014/03/new-chairman-committee-for-national-turkey-federation.

[19] *Id.*

[20] *National Turkey Federation 2015 Officers Elected*, The Poultry Site (Feb. 24, 2015), https://www.thepoultrysite.com/news/2015/02/national-turkey-federation-2015-officers-elected.

[21] *Id.*

150.    In February 2016, John Reicks (vice president of internal operations for Tyson Foods) was elected as 2016 NTF chairman at the NTF Annual Convention.  As of that time, Mr. Reicks had been an active member of the NTF for nine years and an Executive Committee member since 2008.[22]

151.    During the 2016 NTF Annual Convention, elections for open seats were held and John Neiman (Cargill) was among those elected to the Executive Committee.  The board also reelected Executive Committee members Gary Cooper (Cooper Farms), Kerry Doughty (Butterball), Glenn Leitch (Jennie-O Turkey Store), and Phil Seger (Farbest).  Executive Committee members appointed Yubert Envia (Foster Farms) as one of two at-large members of the Executive Committee.[23]

152.    According to public sources, Confidential Witness 2 stated that Cooper Farms leadership was involved with the National Turkey Federation during the Conspiracy Period, and Confidential Witness 3 stated that senior Cargill executives attended National Turkey Federation meetings during the Conspiracy Period.

### b.    United States Poultry & Egg Export Council

153.    The United States Poultry & Egg Export Council ("USAPEEC") has its home office in Stone Mountain, Georgia and a network of international offices and consultants in key export markets.  The mission of USAPEEC is to promote exports of U.S. poultry and eggs around the world.  The council has evolved into an advocate for the industry on trade-policy issues.  USAPEEC has about 200 member companies and organizations.  The council holds Board of

---

[22]    *NTF Elects Officers*, Poultry Times (Apr. 21, 2016), https://www.poultrytimes.com/article_c7161b05-6bdd-5c18-a8f2-db0b1461abcb.html.

[23] *Id.*

Directors meetings quarterly.  During the Conspiracy Period all or nearly all Defendants were members of USAPEEC and had representatives on its Board of Directors.

154.    Public sources indicate that in April 2014, Steve Lykken (Hormel) and Joel Coleman (Vice President of USAPEEC), organized the USAPEEC turkey subcommittee.  The mission of the subcommittee was to establish a coordinated industry effort to pursue open market access and a unified approach to export issues affecting the turkey membership and create a unified approach to turkey export issues affecting the turkey membership.  The group met during all USAPEEC conferences and as otherwise necessary.  The subcommittee that was initially organized to establish a coordinated industry effort soon became hesitant to allow other industry members to join as some members wanted to keep the group small and inaccessible to others.

155.    Members, otherwise known as stakeholders, that supported the subcommittee reportedly included Ryan Downes (Farbest), Kent Puffenbarger (Prestage), Terry Chrismond (Tyson), Kathy Cline (Cooper Farms), Jay Simpson (Perdue), Joel Coleman (Butterball), Steve Lykken (Hormel), Jay Maxwell (Hormel), Rick Schaulis (Cargill), Rick Porter (West Liberty Foods) and Lauren Bartels (Foster Farms).

### c.    U.S. Poultry & Egg Association

156.    The U.S. Poultry & Egg Association ("U.S. Poultry") describes itself as the world's largest and most active poultry organization. U.S. Poultry's members include producers and processors of broilers, turkeys, ducks, eggs, and breeding stock, as well as allied companies.  Most or all of the Defendants were members of U.S. Poultry during the Conspiracy Period.

157.    U.S. Poultry holds regular Board of Directors meetings each quarter during January, March, June, and each fall. Defendants Butterball, Cargill, Cooper Farms, Foster, Tyson, and Perdue have had representatives on the Board of Directors.  Gary Cooper, COO of Cooper

Farms, was a Board member for U.S. Poultry from at least 2003 through 2014, and served as its chairman in 2011.[24]

d.      **North American Meat Institute**

158.    Until its 2015 merger into The North American Meat Institute ("NAMI"), the American Meat Institute ("AMI") described itself as "the nation's oldest and largest meat and poultry trade association."   AMI's website routinely boasted that AMI's Packer and Processor Members "cover 95 percent of the nation's beef, pork, lamb and veal products and 70 percent of the nation's turkey products" and touted the "excellent networking and information-sharing opportunities for members of the industry" provided by AMI's "many meetings and educational seminars."

159.    NAMI was formed in 2015 by merging the AMI and the North American Meat Association.  The NAMI website contains similar information, stating that NAMI is "a national trade association that represents companies that process 95 percent of red meat and 70 percent of turkey products in the US and their suppliers throughout America," and its "many meetings and educational seminars . . . provide excellent networking and information-sharing opportunities for members of the industry."

160.    All or nearly all of Defendants (or their closely-affiliated companies) were members of AMI and then NAMI throughout the Conspiracy Period.  Defendants Butterball, Cargill, Hormel (Jim Snee, Stephen Binder and Jeffrey Ettinger), and Tyson (Tom Hayes, Jim Lochner, Mike Larson, and Sara Lilygren) have had representatives on the AMI and/or NAMI Boards.  Almost all of these executives also serve or have served on the 25-person AMI and/or

---

[24]   https://www.thepoultrysite.com/news/2014/03/new-chairman-committee-for-national-turkey-federation

NAMI Executive Committees, and several have been among the five officers of AMI or NAMI, including Sara Lilygren, of Tyson and Jeffrey Ettinger of Hormel.

161.    Throughout the Conspiracy Period, AMI (through 2014) or its offshoot the American Meat Institute Foundation (since 2015) has sponsored the industry's "Annual Meat Conference."  The conference website describes the conference as "a complete education and networking experience."  Many of the Defendants' high-level executives attend the conference.

162.    Throughout the Conspiracy Period, the Annual Meat Conference has included a plenary session focused on how economic issues affect the meat industry, usually entitled "The Economy and Its Impact on Your Business" or "Market Outlook for Meat and Poultry."[25]

163.    Until 2016, first AMI and then NAMI held an Annual Meeting and Outlook Conference each fall.  The NAMI website described the 2015 annual meeting as "a great networking and educational opportunity for the entire industry" with presentations on "key industry topics . . . as well as outlook sessions for 2016 and the member to member education provided by Issues Answers Action."

164.    For years, NAMI also sponsored an annual "Meat Industry Management Conference."  NAMI promoted the 2015 meeting as focusing on a variety of topics, including "economics, and general business topics" and an "always popular Answers Actions session" that "provides structured member interaction on a variety of issues and topics."  The NAMI board met during the 2015 Management Conference.

---

[25]    *Annual        Meat        Conference,*    "2015    AMC    Brochure," http://www.meatconference.com/sites/default/files/books/2015_AMC_Brochure.pdf;    *Annual Meat Conference,* "2016 AMC Brochure," at 6 http://www.meatconference.com/sites/ default/files/books/2016_AMC_Brochure.pdf and *Annual Meat Conference,* "2017 AMC Brochure," p. 5, http://meatconference.com/sites/default/ files/books/2017_MeatBrochure.pdf.

165.    AMI sponsored the "International Meat, Poultry & Seafood Convention and Exposition" in 2009, 2011, and 2012.  In at least 2009 and 2011, AMI conducted its business meeting during the Expo, electing members of its board of directors.  In January 2013, AMI's International Meat, Poultry & Seafood Convention and Exposition was integrated into the "International Production and Processing Expo" ("IPPE"), coproduced by AMI and poultry and feed trade associations.  Promotional materials for the 2014 IPPE indicated that attendees included Hormel and Tyson.  After AMI's 2015 merger into NAMI, NAMI became (and still is) a presenting sponsor, along with the poultry and feed trade associations.

**(2)      Employee Movement Between Defendants Permitted Trusted Former Colleagues to Exchange Pricing and Supply Information.**

166.    In addition to participating in trade associations together, Defendants' employees regularly moved between companies during the Conspiracy Period.  Despite changing companies, these employees kept their pre-existing ties with former colleagues.  These relationships have provided CEOs and other top-level executives with comfort and trust to discuss their competitively sensitive information with each other.

167.    For example, Neal Walsh, Perdue's former executive left the company to join Butterball in 2007 as the Director of Purchasing and became the Chief Operating Officer in 2020.

168.    Dean Lisenby served as Director of Supply Planning for Perdue, before moving to Butterball in 2008 to serve as Senior Director Supply Chain Planning.

169.     Butterball's current Senior Vice President of Retail Sales, Chris Peach came from Perdue to Butterball in 2007.  While at Perdue, Peach was the Director of Sales for 19 years before joining Butterball as their Vice President of Retail Sales.

170.     Rhonda Murphy was employed by House of Raeford before leaving to work for Butterball from 2009–2012 as its Corporate Accounts Manager.  Ms. Murphy resigned from Butterball in April 2012 and returned to House of Raeford as its Director of Sales.

171.     Although the above-mentioned executives no longer work for the same employers, their relationships with former colleagues did not end.  The shared connections ensured they remained in touch and allowed for opportunity, time, and trust to have conversations where they could share sensitive information confidentially.

**(3)     Defendants Provided One Another Frequent Access to Their Facilities, Permitting Extensive Opportunities to Share Information.**

172.     It has been publicly reported that throughout the Conspiracy Period, Defendants frequently requested and permitted visits and tours of their facilities to competitors.  Plant tours and visits, like many other private interactions, gave Defendants opportunities to discuss and share competitively sensitive information.  The visits also helped develop relationships between Defendant competitors that facilitated unlawful acts.

**(4)     Other Informal Events Gave Defendants Private and Confidential Opportunities to Directly Exchange Pricing and Supply Information.**

173.     According to public documents, Defendants organized and attended numerous sporting events together during the Conspiracy Period, including basketball games and golf outings.  Private dinners also provided opportunities for Defendants' senior executives to meet with one another during the Conspiracy Period.  These events took place during formal conferences, and some occurred outside that context.  Many of Defendants' high-ranking executives appeared to be close personal friends and would communicate frequently.

E.     **Tyson Has Admitted Violating Federal Antitrust Law With Respect to the Pricing and Sale of Chicken During the Conspiracy Period in this Case.**

174.     In April 2019, the Antitrust Division of the Department of Justice ("DOJ") served Defendant Tyson with a grand jury subpoena in connection with the DOJ's criminal investigation of the broiler chicken industry.   Tyson later announced that it had applied for leniency from prosecution under the DOJ's Corporate Leniency Program, pursuant to which Tyson had to admit it participated in activity constituting a criminal antitrust violation and fully cooperate with the DOJ, to avoid criminal prosecution and fines.

175.     According to Tyson's 10K Report for the fiscal year ending October 1, 2022, Tyson was continuing to cooperate with the DOJ in connection with the ongoing federal antitrust investigation of the broiler chicken industry.

F.     **The Structure of the Turkey Industry Was Conducive to Conspiracy.**

176.     As explained below, there were one or more conditions and events in the turkey industry during the Conspiracy Period, or "plus factors," that made the market for the production and sale of turkey conducive to cartelization.

(1)     **Turkey Was a Commodity Product With Inelastic Demand.**

177.     Turkey products are a commodity or possess commodity-like characteristics in that the product of one seller is interchangeable with the product of another.   Turkey had this characteristic during the Conspiracy Period and at other times relevant to Plaintiffs' claims.

178.     Indeed, the Agri Stats reports themselves show that turkey is fungible because they aggregate data across Defendants for particular types of turkey products and allow Defendants to compare detailed information on prices for the same fungible product.   It has been publicly reported that Confidential Witness 1 (Butterball) confirmed that the Agri Stats reports were organized by specific item of turkey product.

179.    Because turkey is a commodity product, all things being equal, it would not be profitable for Defendants to unilaterally increase turkey prices in the United States, because a unilateral price increase by any one Defendant would allow a competitor to take substantial market share by simply holding its price.  The commodity or commodity-like characteristic of turkey products made the market for the production and sale of turkey conducive to cartelization.

180.    Inelastic demand means that it is profitable for members of a cartel to raise the price of a good above competitive levels.  In simple terms, demand is inelastic when the loss in volume arising from a price increase is small relative to the magnitude of the increase in price.  Price elasticity of demand ("PED") is a measure used to quantify the degree to which quantity demand for a good or service changes with respect to price.[26]  A price elasticity of demand value between 0 and -1 indicates there is inelastic demand for the good or service, *i.e.*, a 1 percent increase in price induces a less than 1 percent decrease in quantity demanded. Markets with a highly inelastic demand can help facilitate collusion as producers have the ability to raise prices without a significant impact on quantity demanded.  The USDA has estimated that the average PED estimate for the turkey market is -0.58, meaning the demand for turkey is inelastic.  During the Conspiracy Period and at other times relevant to Plaintiffs' claims, the demand for turkey was inelastic.

181.    Turkey is homogenous within cut type, *i.e.*, a ground turkey from Tyson and Cargill are virtually indistinguishable.  Collusion becomes easier for manufacturers of a homogenous

---

[26] *See, e.g.*, Jeffrey M. Perloff, Microeconomics with Calculus, 28–31 (2d Ed.); Patrick L. Anderson, et al.,

Price    Elasticity    of    Demand    (Nov.    13,    1997),    *available    at* https://scholar.harvard.edu/files/alada/files/

price_elasticity_of_demand_handout.pdf; Gadi Fibich, Arieh Gavious & Oded Lowengart, The Dynamics of Price

Elasticity of Demand in the Presence of Reference Price Effects, 33 J. Academy Mktg. Science 66–78 (2005).

product when prices are the only way in which products can be differentiated from one another. Turkey is a tangible, commodity product with little or no product differentiation between producers.  As such, turkey products are highly substitutable, making it easier for competitors to agree on a common pricing structure.

182.    To the extent that a relevant market definition is or becomes necessary in this case, it is defined as the market for the production and sale of turkey in the United States.  As alleged earlier, the Defendants had approximately 70% of this relevant market, *i.e.*, substantial market power, during the Conspiracy Period.

**(2)    Defendants Controlled the Supply of Turkey in the United States, Which Allowed the Conspiracy to Succeed.**

183.    In the turkey industry, the phrase "vertically integrated" means that the turkey producing company owns or controls each aspect of breeding, hatching, rearing, feeding, basic processing, and selling of turkey.  Many vertically integrated turkey producing companies also own further processing plants.  The turkey industry is highly vertically integrated, with turkey-producing companies owning or tightly controlling almost all aspects of production, processing, and marketing turkey.  The National Turkey Federation states that "turkey companies are vertically integrated, meaning they control or contract for all phases of production."

184.    For example, Butterball has over 175 farms that they own, as well as contracts with numerous independent farmers.  Hormel owns over 100 commercial growing farms.  Cargill owns around 700 farms.  Farbest has more than 200 contract growers.

185.    The turkey industry was characterized by a high degree of vertical integration during the Conspiracy Period and at all other times relevant to Plaintiff's claims.

186.     During the Conspiracy Period and other relevant times, the turkey market was also concentrated, with relatively few sellers.  Defendants controlled approximately 70% of the market from 2008–2018.

*Figure 3*

Average Market Share of Turkey Producers (2010 - 2018)



187.     The turkey market has been subject to steadily increasing consolidation over the last several decades.  In the 1970s, the turkey market was defined by competition among dozens of companies that worked with independent farmers.  But now, just four corporations—Cargill, Hormel, Butterball, and Farbest—produce more than half of the turkey in the United States.

**(3)     There Were High Barriers to Entry in the Market for Turkey.**

188.     The existence of high barriers to entry is one factor which makes markets susceptible to collusion.  A collusive arrangement that raises product prices above competitive

levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely.  Thus, barriers to entry help facilitate the formation and maintenance of a cartel. High barriers to entry in the turkey processing market exist, precluding other entrants or would-be competitors from entering the market for turkeys raised for consumption.

189.    During the Conspiracy Period and continuing today, substantial barriers impede entry into the turkey market.  A new entrant into the market would face costly and lengthy start-up costs, including multimillion-dollar costs associated with research and development, equipment, energy, transportation, distribution, infrastructure, skilled labor, experienced management, a skilled contract-farmer base in a specific geographic area, long-standing customer relationships, safety and quality assurance, and regulatory approvals relating to environmental, worker safety, and food safety issues.

190.    The price of construction of a new integrated turkey processing complex is relatively high.  For example, the cost for a current market participant, Virginia Poultry Growers Cooperative, to construct a new turkey processing in 2015 was $62 million.

## V.    PLAINTIFF'S CLAIMS ARE TIMELY

### A.    American Pipe Tolling

191.    Plaintiff's claims have been brought within the applicable statute of limitations period.  Plaintiff's assignor, Sysco, having purchased turkey directly from one or more Defendants, was a member of the putative direct-purchaser class first alleged in *Olean Wholesale Grocery Cooperative, Inc. and John Gross and Company, Inc. v. Agri Stats, Inc. et al.* (N.D. Ill. Case No. 19-cv-08318), filed in the U.S. District Court for the Northern District of Illinois on December 19, 2019.  Neither Plaintiff nor Sysco had actual or constructive knowledge of the facts constituting

the claims for relief, and Plaintiff and Sysco did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein before the claims were tolled by the filing of the *Olean* complaint on December 19, 2019.

192.   By virtue of the filing of the *Olean* complaint, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiff has as a result of the unlawful combination and conspiracy alleged in this Complaint beginning at least as early as December 19, 2019, under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities, and remain tolled during the pendency of the direct purchaser class action asserted against non-settling Defendants.

**B.     Fraudulent Concealment**

193.   During the Conspiracy Period, and as alleged in detail in this Complaint, Defendants conducted their conspiracy in secret and created pretexts to avoid detection of their unlawful conduct.  This concealing conduct included coordinating their supply plans at or incident to trade group meetings and events in order to give their collusive meetings the appearance of legitimacy, communicating with each other by telephone to avoid written records of what they said, limiting knowledge of the conspiracy to only an inner circle of senior executives, and providing deceptive and pretextual statements to their customers and to the public in justifying supply cuts and price increases that were intended to conceal—and did in fact conceal—that these actions were the result of collusion.

194.   "Cartels try to make their actions look indistinguishable from noncollusive conduct" and "can reduce buyer resistance by offering plausible justifications for their price increases."[27]   During the Conspiracy Period, Defendants publicly and pretextually claimed that

---

[27] Robert C. Marshall and Leslie M. Marx, *The Economics of Collusion: Cartels and Bidding*

increases in their turkey production input costs or other seemingly plausible reasons were responsible for increased turkey prices when, in fact, they were not.  This created the illusion that the price of turkey that they sold to Plaintiffs was competitive, when, in fact, it was not because their turkey prices were the result of the conspiracy.

195.    For example, in 2012, Tyson's CEO insisted publicly that Tyson Foods "need[ed] to get our pricing improvements in order to get paid for those higher raw materials."[28]   His statements indicate at the time that he understood customers would—in his words—"understand that these higher grain prices are going to require higher prices."[29]

196.    Defendants also fraudulently concealed their conspiracy through their use of Agri Stats and its subsidiary EMI.  Agri Stats is a secretive company, and repeatedly made affirmative statements about the public's lack of access to and information about its services.  For example, in 2009, the President of Agri Stats, Blair Snyder, explained:

> Agri Stats has always been kind of a quiet company. ***There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do. It's always kind of just in the background***, and really our specialty is working directly with companies about their opportunities and so forth.

197.    But Agri Stats did not just conceal the conspiracy alleged herein by being a "quiet company" that did not advertise or "talk about what we do" in public, it also engaged in numerous affirmative acts to conceal the alleged conspiracy during the Conspiracy Period.  Specifically, Agri Stats made repeated false or misleading statements about the true nature of the information that it

---

*Rings.* Cambridge, MA: MIT Press, 2012.

[28] Q4 2011 Tyson Earnings Conference Call (November 21, 2011).

[29] Q4 2012 Tyson Earnings Conference Call (November 19, 2012).

provided to Defendants, all of which served to exclude suspicion and prevent discovery of Defendants' illegal scheme.

198.    For example, in the same 2009 presentation discussed above about the "quiet" and secretive nature of Agri Stats, Mr. Snyder also emphasized that he was not at liberty to discuss "bottom line numbers" (a company's net earnings), and declined to display those numbers publicly, stating: "I'm not going to display the actual bottom line to the group here just because of the confidentiality nature of the information."  However, while affirmatively asserting that it was unable to share this information publicly due to "confidentiality" concerns, Agri Stats was at the same time providing producers with the "bottom line numbers" of their competitors on a regular basis via the reports discussed above.  These statements thus acted to conceal the true detail and nature of the Agri Stats reports from Plaintiffs and the public in general.

199.    Agri Stats repeatedly asserted in public that its reports did not disclose or identify any individual participant's data to any other participant and that each producer's data were kept confidential: "The fact that we collect a tremendous amount of data, and you'll see that throughout the presentation as we talk.  I've got some demo examples of what we do.  Obviously, no individual companies are identified or talked about'; "We'll talk about comparison of data in a little bit, but the main thing is that we want to preserve the confidentiality of individual companies, so you'll hear that word a lot throughout the presentation.  I apologize but that's what we're all about'; and "The confidentiality, only your company is underlined; you don't know who anybody else is." Contrary to these public statements, in private, Agri Stats knowingly and intentionally shared Defendants' competitively sensitive information with the others, who were able to identify individual firm information in the Agri Stats reports.

200.     As a direct result of Defendants' affirmative acts of concealment, neither Plaintiff nor its assignor, Sysco, had either actual or constructive knowledge of the facts constituting its claim for relief.  Neither Plaintiff nor Sysco discovered, nor could they have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this complaint.  Defendants engaged in a secret information exchange that did not reveal facts that would put Plaintiff or Sysco on inquiry notice that there was an anticompetitive agreement to exchange information regarding the market for turkey.  Throughout the Conspiracy Period, Defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from Plaintiff and Sysco, thereby tolling the statute of limitations for Plaintiff's claim asserted in this Complaint.

## VI.     CAUSE OF ACTION: VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

201.     "The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade," and "the policy unequivocally laid down by the Act is competition."  *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958); *see also NCAA v. Alston*, 141 S. Ct. 2141, 2144 (2021) ("In the Sherman Act, Congress tasked courts with enforcing a policy of competition on the belief that market forces 'yield the best allocation' of the Nation's resources.").

202.     "The Sherman Act adopted the term 'restraint of trade' along with its dynamic potential," which "refers not to a particular list of agreements, but to a particular economic consequence, which may be produced by quite different sorts of agreements in varying times and circumstances."  *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 731-32 (1988); *see also Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948) ("The

[Sherman] Act is comprehensive in its terms and coverage, protecting all who are made victim of the forbidden practices by whomever they may be perpetrated.").

203.    Therefore, the Sherman Act reaches any concerted scheme to affect prices.  *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940) (The Sherman Act covers "agreements to raise or lower prices whatever machinery for price-fixing was used.").  Its target is any of the "many forms of restraint upon commercial competition" which "tend to raise prices or otherwise take from buyers or consumers the advantages which accrue to them from free competition in the market."  *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 495, 497 (1940).

204.    Plaintiff incorporates and realleges the allegations in the preceding paragraphs.

205.    Beginning around 2008 and continuing at least through 2016, with lingering effects thereafter, the exact dates being unknown to Plaintiff, Defendants entered into a continuing agreement and engaged in unreasonable restraints of trade and commerce regarding the production and pricing of turkey, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, accomplished by various means, with the exact means to be established at trial.

206.    The course, pattern, and practice of conduct described above included, among other things, and without limitation, agreement, understanding and concerted action among Defendants, the substantial terms and purpose of which included one or more of the following:

(a) To control and restrict the production and/or sale of turkey to Sysco and others in the United States;

(b) To fix, stabilize, maintain, and/or raise prices of turkey sold to Sysco and others in the United States; and/or

(c) To earn supra-competitive profits on the price of turkey sold to Sysco and others in the United States that resulted from Defendants' collusion.

53

207.    To formulate and effect the foregoing illegal combination and conspiracy, Defendants engaged in, among other conduct, one or more of the following overt acts (including those overt acts alleged in this Complaint):

(a) They agreed to exchange, and did exchange, current and future competitively sensitive information about turkey sold in the United States;

(b) They agreed to coordinate, and did coordinate, production levels of turkey produced in the United States; and/or

(c) They agreed to restrict, and did restrict, the supply of turkey in the United States.

208.    Defendants entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in communications to discuss the restriction of turkey production in the United States; participating in communications concerning the implementation of and adherence to their conspiracy; issuing statements about their restriction of turkey production in accordance with the conspiracy; and/or exchanging competitively-sensitive information on the production, pricing and/or sale of turkey in the United States.

209.    Defendants' unlawful agreements to exchange, and the actual exchanges of non-public, timely, and detailed data were not reasonably necessary to further any procompetitive purpose.  The information exchanged between Defendants was current, easily traceable to its source, confidential, and related to a core characteristic of competition between them.

210.    To the extent necessary for adjudication of Plaintiff's claim, the relevant product market is turkey and the relevant geographic market is the United States.

211.    Defendants possess market power in the relevant market.  Defendants' collective market power includes the power to artificially deflate the amount of turkey produced in the United

States below competitive levels and to artificially inflate the price paid for turkey above competitive levels.

212.    Defendants could impose an increase in the price of turkey without causing many consumers to switch their purchases to another product.

213.    Turkey products are generally interchangeable, permitting Defendants to readily to compare and match each other's pricing.

214.    Numerous "plus factors" further support the inference of an agreement, including 1) direct information exchanges among Defendants regarding current production levels, such as through participation in the Midwest Consortium; 2) frequent exchanges between Defendants of competitive pricing information; 3) numerous opportunities to collude through participation in trade associations and other social interactions; 4) a market structure conducive to collusion; and 5) a motive to conspire in that supply reductions led to higher prices for turkey products.

215.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint.

216.    Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of turkey to be higher than it would be but for Defendants' conduct.

217.    Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

218.    Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by fixing, raising, stabilizing, or maintaining prices for turkey throughout the United States.

219.    During the Conspiracy Period, Sysco purchased substantial amounts of turkey from Defendants and/or their divisions, subsidiaries, and affiliates.

220.    As a direct, proximate, and foreseeable result of Defendants' above-described illegal, anticompetitive conduct, during the Conspiracy Period, competition was restrained, suppressed, or eliminated with respect to turkey, and Sysco was deprived of free and open competition with respect to turkey.

335.    As a direct, proximate, and foreseeable result of Defendants' above-described illegal, anticompetitive conduct, during the Conspiracy Period, turkey prices were fixed, raised, stabilized, or maintained at artificially inflated, supra-competitive levels, and Sysco was compelled to pay, and did pay, higher prices for turkey than it would have paid in the absence of Defendants' illegal conduct.

221.    As a direct, proximate, and foreseeable result of Defendants' above-described illegal, anticompetitive conduct, Sysco was injured in its business or property by paying more for turkey than it would have paid in the absence of the conspiracy.  The full amount and forms and components of Plaintiff's resulting damages will be calculated after discovery, and presented upon proof at trial.

222.    The above-described injuries are antitrust injuries of the type that the antitrust laws were meant to prohibit and flows from that which makes Defendants' conduct unlawful.

## VII.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed a violation of Section 1 of the Sherman Act;

Plaintiff recover damages, to the maximum extent allowed under federal antitrust laws, and that a joint and several judgment in favor of Plaintiff be entered against Defendants in an amount to be trebled under U.S. antitrust laws;

Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

Plaintiff be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

Plaintiff recover its costs of suit, including reasonable attorneys' fees, as provided by law; and

Plaintiff has such other and further relief as the case may require and the Court may deem just and proper.

## VIII.   JURY TRIAL DEMANDED

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: July 21, 2023

/s/ *Michael S. Mitchell*
Scott E. Gant (*pro hac vice* forthcoming)
Michael S. Mitchell (*pro hac vice* forthcoming)
Boies Schiller Flexner LLP
1401 New York Ave., NW
Washington, DC 20005
Tel: 202-237-2727
Fax: 202-237-6131
sgant@bsfllp.com
mmitchell@bsfllp.com

Colleen Harrison (*pro hac vice* forthcoming)
Boies Schiller Flexner LLP
333 Main Street
Armonk, NY 10504
Tel: 914-749-8204
Fax: 914-749-8300
charrison@bsfllp.com

Sarah L. Jones (*pro hac vice* forthcoming)
Boies Schiller Flexner LLP
725 South Figueroa Street
Los Angeles, California 90017
Tel: 213-629-9040
Fax: 213-629-9022
sjones@bsfllp.com

Christopher A. Seeger (*pro hac vice* forthcoming)
Jennifer Scullion (*pro hac vice* forthcoming)
Seeger Weiss LLP
55 Chandler Rd.
Ridgefield  Park, NJ 07600
Tel: 212-584-0700
cseeger@seegerweiss.com
jscullion@seegerweiss.com

*Counsel for Plaintiff Carina Ventures LLC*